## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**LESLIE STANLEY,**

      **Petitioner,**

**v.**

**JULIUS FLAGG,**[1]

      **Respondent.**                  **Case No. 00-CV-895 DRH**

## MEMORANDUM & ORDER

**HERNDON, District Judge:**

## I.  INTRODUCTION

Before the Court is Petitioner Leslie Stanley's ("Stanley" or "Petitioner")

Amended Habeas Petition for a Writ of Habeas Corpus pursuant to **28 U.S.C. § 2254**

(Doc. 15) and Motion to Strike Respondent's Affirmative Defenses (Doc. 33).  As the

Court stated in its previous Order (Doc. 54), Petitioner is currently serving a 35-year

prison sentence for being convicted of first degree murder.   A Report and

Recommendation ("R&R") (Doc. 34) was issued by United States Magistrate Judge

Phillip M. Frazier, recommending Petitioner's amended habeas petition and Motion

to Strike be denied.   The Court then appointed counsel for Petitioner to aid with

---

[1]  Mark Pierson had been named as Respondent in this matter.  However, in Respondent's Proposed Findings of Fact and Conclusions of Law (Doc. 86), Respondent states that Petitioner is imprisoned at the Pinckneyville Correctional Center, where Julius Flagg is the warden.  Therefore, pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases and **FEDERAL RULE OF CIVIL PROCEDURE** 25(d)(1), Julius Flagg is now hereby named as Respondent in this matter.  ***See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).**

further proceedings (Doc. 44).  Petitioner thereafter filed objections to the R&R (Doc. 52), specifically objecting to the Magistrate Judge's findings that certain actions of Petitioner's trial counsel did not amount to ineffective assistance of counsel and to findings that certain other actions of trial counsel were not excepted from being in procedural default due to the resulting miscarriage of justice.

The Court, in conducting a *de novo* review[2] of Petitioner's Amended Habeas Petition and Motion to Strike, found that an evidentiary hearing, pursuant to **28 U.S.C. § 2254(e)(2)**, was necessary in order to develop an adequate record (Doc. 54, pp. 13-14).  This evidentiary hearing took place before this judge on January 24, 2006 (Doc. 79).  At the close of this hearing, both parties requested they be allowed to submit briefs to the Court for consideration in lieu of closing arguments, stating their proposed findings of fact and conclusions of law, to which the Court agreed, setting a briefing schedule (*Id.*).  Now that the parties have submitted their respective briefs, the Court will once again consider Petitioner's Amended Habeas Petition and Motion to Strike in light of the Magistrate Judge's findings in the R&R, the evidence presented by the parties at the January 24, 2006 evidentiary hearing, and the proposed findings of fact and conclusions of law submitted by the parties.

---

[2]  **See 28 U.S.C. § 636(b)(1)(B); FED. R. CIV. P. 72(b); Southern District of Illinois Local Rule 73.1(b); Govas v. Chalmers, 965 F.2d 298, 301 (7th Cir. 1992)**.  Upon such review, the Court may "accept, reject, or modify the recommended decision."  **Willis v. Caterpillar Inc., 199 F.3d 902, 904 (7th Cir. 1999)**.

## II. <u>PROCEDURAL BACKGROUND</u>

**A.    TRIAL PROCEEDINGS**

Petitioner was convicted of the crime of murder in the first degree of Sammie Wilborn and is currently serving a 35-year prison sentence in Pinckneyville Correctional Center.  Petitioner was represented by Public Defender, attorney Jon Allard ("Allard"), during his two-day trial in the Circuit Court of St. Clair County, Illinois, on May 11 and 13, 1994 (January 24, 2006 Evidentiary Hearing ("Evid. Hr."), Ex. 17, Vols. I & II, - Trial Transcript ("Tr.")).

As recounted by the Court in its previous Order granting Petitioner an evidentiary hearing (Doc. 54), the only eye-witness to the murder was James Dean, a convicted felon, who was admittedly under the influence of cocaine, marijuana, and alcohol on the night of the murder (Evid. Hr., Ex. 17 - Trial Tr., Vol., I, pp. 30, 36). Dean also admitted to arguing with Wilborn the night of the murder over a "straight shooter" used for smoking cocaine (*Id*. at 22).  According to Dean, there was a group of about fifteen people gathered on Crenshaw street in the Centreville projects getting high on cocaine, smoking weed, and drinking beer on the night of the murder (*Id*. at 21, 35).

Dean told the jury that he and Wilborn were among those getting high on cocaine (*Id*. at 20).  Dean testified that he got in the passenger seat of a yellow Lincoln driven by Petitioner[3] and Wilborn got in the back seat of the car; Dean and

---

[3]  Dwana Stanley's husband, Willie Snipes, testified that on December 21, 1993, he lent Petitioner his yellow '79 Lincoln Continental (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 50-51).

Wilborn were still fighting over the shooter (*Id*. at 22, 38-40).  The trio drove around the back streets of Centreville for about 20 minutes, when Dean asked to go back to the projects (*Id*. at 24).  After promising to take Dean back, Petitioner stopped the car near a dead end because Wilborn had to urinate (*Id*. at 27).

Prior to the stop, Dean noticed Petitioner had a German automatic gun with him (*Id*. at 26).  Dean testified he then saw Petitioner get out of the car and fire two shots at Wilborn,[4] at which point Dean took off running towards the projects hearing a third shot fired as he fled (*Id*. at 28, 41).  Dean testified he did not call the police because he was scared (*Id*. at 29), but later gave the police a statement after he was picked-up for his involvement in Wilborn's murder (*Id*. at 43).  Dean testified Petitioner came to his house a few days after the murder and told Dean that Wilborn had messed up his eight-ball of cocaine (*Id*. at 33).

The second crucial witness to testify against Petitioner was his sister, Dwana Stanley (*Id*. at 58).  She testified that Petitioner confessed to her that he killed somebody, but would not say who (*Id*. at 60-61).  On cross-examination, Ms. Stanley confirmed that her brother always said things like that when he was intoxicated (*Id*. at 64).  She also told the jury that Petitioner had a small black .22-caliber gun with him the night he said he killed somebody (*Id*. at 62); however, no gun was ever recovered.

_____

[4]Dean's testimony on this point is inconsistent.  On direct examination Dean testified he heard two shots (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 28-29).  However, while on cross-examination, Dean said he saw Petitioner fire two shots (*Id*. at 41).

There was no physical evidence presented at trial to tie Petitioner to the murder.  Petitioner's trial counsel, Allard, offered no evidence to disprove the State's theory, instead choosing to craft his defense around the cross-examination of the State's witnesses.[5]

**B.    APPELLATE AND POST CONVICTION PROCEEDINGS**

After his conviction, Petitioner was represented by his court-appointed counsel Ann Hatch for the sentencing and post-trial proceedings.  During sentencing, Petitioner raised the issue of ineffective assistance of counsel, arguing that "none of the witnesses were subpoenaed nor were they ever interviewed with respect to potential conflicts concerning the evidence" (Evid. Hr., Ex. 18 - Sentencing Transcript ("S. Tr."), p. 26).  However, Petitioner's motion for a new trial was denied, the state court finding that his trial counsel, Allard, was effective (*Id*. at 33-35; *see also* Doc. 54, pp. 4-6).

On direct appeal of his conviction, Petitioner discharged his counsel and represented himself, submitting a *pro se* appellate brief to the Illinois Court of Appeals, arguing, among other things, ineffective assistance of trial counsel (*see* Doc. 11, Ex. A - Defendant-Appellant *Pro Se* Brief, pp. 64-66; *see also* Doc. 34, Appendix A, pp. 19-20).  Petitioner's appeal was denied by the Illinois Appellate Court (Doc. 11, Ex. B, June 26, 1997 Rule 23 Order; *see also* Doc. 54, pp. 6-8).  The Illinois Supreme Court thereafter denied Petitioner leave to appeal the decision of the

---

[5] Allard's closing argument encompassed only a small percentage of the nearly two hundred page trial transcript.

appellate court on his direct appeal (Doc. 11, Ex. C - Petition for Leave to Appeal and Ex. D, December 3, 1997 Order Denying Leave to Appeal).

After his direct appeal was denied, Petitioner then initiated post-conviction proceedings under the Illinois Post-Conviction Hearing Act, **725 ILL. COMP. STAT. 5/122-1 - 5/122-8**, again raising claims regarding ineffective assistance of trial counsel  (Doc. 11, Exs. E&F - Post-Conviction Petition & Memorandum). After an evidentiary hearing was conducted, the Illinois circuit court denied the post-conviction petition (Doc. 11, Ex. G - Circuit Court Order of December 9, 1998). Petitioner subsequently appealed this denial, continuing to state several claims of ineffective assistance of counsel (Doc. 11, Ex. H - Petitioner's Post Conviction Appellate Brief).  Once again, Petitioner's appeal was denied by the Illinois Court of Appeals (Doc. 11, Ex. I - June 22, 2000 Rule 23 Order).  Petitioner then filed for leave to appeal with the Illinois Supreme Court (Doc. 11, Ex. J - Post Conviction Petition for Leave to Appeal), review of which was thereby denied (Doc. 11, Ex. K - October 4, 2000 Order).

## C.    HABEAS PROCEEDINGS

Petitioner's final avenue of approach was to file for writ of habeas corpus with a United States District Court, pursuant to **28 U.S.C. § 2254**.  Petitioner therefore filed his Habeas Petition with this Court (Doc. 1), which he later amended (Doc. 15).  In his Amended Habeas Petition, Petitioner reasserts his claims for ineffectiveness of trial counsel for the following: (1) failure to interview Dwana

Stanley, Bryant Swygeart, Robert Brock, Lavonda McNair, James Dean, Stanley Williams, Willie Snipes and Tamara Evans prior to trial; and (2) failure to call Bryant Swygeart, Stanley Williams, Robert Brock and Willie Snipes to testify at trial.

The Magistrate Judge reviewed Petitioner's Amended Habeas Petition, Respondent's Amended Answer and Affirmative Defenses (Doc. 26) and Petitioner's Motion to Strike Respondent's Affirmative Defenses (Doc. 33). In the R&R, issued on August 24, 2004 (Doc. 34), the Magistrate recommended the Court deny Petitioner's Amended Habeas Petition with prejudice, along with Petitioner's Motion to Strike.

To summarize, the R&R found the following of Petitioner's habeas claims to be in procedural default: (1) trial counsel was ineffective for failure to interview witnesses James Dean, Tamara Evans, Stanley Williams and Willie Snipes before trial (Doc. 34, p. 6); and (2) trial counsel was ineffective for failure to call Bryant Swygeart, Stanley Williams, Robert Brock and Willie Snipes as witnesses to testify at trial (*Id*. at 12-14). However, the R&R found Petitioner's habeas claims that trial counsel was ineffective for failure to interview witnesses Dwana Stanley, Robert Brock, Bryant Swygeart and LaVonda McNair, were *not* in procedural default (*Id*. at 5-11). Considering Petitioner's claims which were not in procedural default, the R&R concluded that Petitioner was not entitled to habeas relief. Petitioner filed objections to the R&R (Doc. 40), pursuant to **28 U.S.C. § 636(b)** and **LOCAL RULE 73.1(b)**; the Court determined it necessary and appropriate to appoint counsel to represent Petitioner (Doc. 44), whereby counsel for Petitioner filed Amended Objections to the

R&R (Doc. 52).

Upon *de novo* review of the R&R, considered in light of Petitioner's objections thereto, the Court issued an Order (Doc. 54) finding Petitioner was entitled to an evidentiary hearing, pursuant to **28 U.S.C. § 2254(e)(2)**, regarding his claims of ineffectiveness of trial counsel, in order for the court to fully develop the record.  The Court found that the Illinois state courts never considered Petitioner's claims *in toto* in a full and fair hearing and also applied a higher evidentiary standard was applied than required under ***Strickland v. Washington*, 466 U.S. 668 (1984)(ineffective assistance of counsel standard)** (Doc. 54, pp. 16-18).

**D.    EVIDENTIARY HEARING ON AMENDED HABEAS PETITION**

The Court ordered an evidentiary hearing be conducted on January 24, 2006, pursuant to **28 U.S.C. §2254(e)(2)**.  At that hearing, the following witnesses were called on behalf of Petitioner: (1) John Allard, (2) Michael Stanley, (3) Leslie Stanley, and (4) Lee Lawless.  Among Petitioner's 25 exhibits admitted at the hearing was the deposition transcript of Robert Brock, taken July 27, 2005, while he was incarcerated in the Lakeland Correctional Facility in Coldwater, Michigan (Doc. 82, p. 10; *see also* Evid. Hr., Ex. 19 - Brock Deposition Transcript ("Brock Depo. Tr."), p. 6).  Also included among Petitioner's exhibits were copies of the discovery materials that the State tendered to Allard prior to Petitioner's trial, including witness statements, Wilborn's autopsy report, forensic reports, a computer drawn map of the location where Wilborn's body was found (Doc. 82. at p. 12; *see also*

Evid. Hr., Ex. 16 - Map), and photos of Wilborn's body and the general crime scene area (Doc. 82 at pp. 12-13; *see also* Evid. Hr., Group Ex. 20 - Photos)..

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court will proceed to state its findings of fact and conclusions of law, pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 52(a)**, based upon the January 24, 2006, evidentiary hearing.

### A.    LEGAL STANDARD

#### (1)    Review of the R&R

1.      Petitioner filed timely objections to the R&R (*see* Doc. 50 - Order granting extension of time for Petitioner's court-appointed counsel to file amended objections to the R&R; *see also* Doc. 52).  Therefore, the Court must undertake *de novo* review of the objected-to portions of the Report.  **28 U.S.C. § 636(b)(1)(B); FED. R. CIV. P. 72(b); SOUTHERN DISTRICT OF ILLINOIS LOCAL RULE 73.1(b);** *Govas v. Chalmers***, 965 F.2d 298, 301 (7th Cir. 1992)**.

2.      The Court may "accept, reject, or modify the recommended decision." *Willis v. Caterpillar Inc.***, 199 F.3d 902, 904 (7th Cir. 1999)**.

3.      In making this determination, the Court must look at all the evidence contained in the record and give fresh consideration to those issues to which specific objection has been made.  *Id*.  Thus, the Court will conduct a *de novo* review of Petitioner's Amended Habeas Petition (Doc. 15) as well as his Motion to Strike Respondent's Affirmative Defenses (Doc. 33).

      **(2)**      **Review of a § 2254 Habeas Petition**

             **(i)**     *The AEDPA*

4.      The Court's review of Petitioner's Amended Habeas Petition (Doc. 15) is governed by the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  **28 U.S.C. § 2254**.

5.      AEDPA permits a federal court to issue a writ of habeas corpus if the state court reached a decision on the merits of a claim, and that decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  ***Martin v. Grosshans*, 424 F.3d 588, 590 (7th Cir. 2005)(quoting 28 U.S.C. § 2254(d))**.

6.      The clauses "contrary to" and "unreasonable application" stated within § 2254 have independent meaning.  ***Bell v. Cone*, 535 U.S. 685, 694 (2002)(citing *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000)); *see also Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000)(also citing *Williams*)**.

7.      As such, for a state court's decision to be " 'contrary to . . . clearly established Federal law as established by the United States Supreme Court,' " it must be " 'substantially different from relevant [Supreme Court] precedent.' " ***Washington*, 219 F.3d at 628 (citation omitted)**.  Typically, this would involve the state court "appl[ying] a rule different from the governing law set forth in [cases of

the United States Supreme Court], or if it decides a case differently than [the United States Supreme Court] on a set of materially indistinguishable facts." **Bell, 535 U.S. at 694 (citing Williams, 529 U.S. at 404-05)**.

8.      In order for a state court's decision to result in a decision that "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," the decision must be "objectively unreasonable." **Id.**

9.      It is important to note that "an unreasonable application is different from an incorrect one" – meaning that a district court is not allowed to merely substitute its own judgment as to what it believes is the correct outcome, absent a finding that the state court's decision was unreasonable. **Id.; see also Washington, 219 F.3d at 628**.

### (ii)   *Procedural Default*

10.     Procedural default occurs when a petitioner fails to present a claim to the state courts at the time and in the way required by the state. **Hogan v. McBride, 74 F.3d 144, 146 (7th Cir. 1996)**.

11.     If a state court declines to review a petitioner's claim because the petitioner has failed to satisfy a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review. **Pisciotti v. Washington, 143 F.3d 296, 300 (7th Cir. 1998)**.

12.     Further, if a petitioner completely fails to raise a claim to the state

courts, this will constitute procedural default and conclusively bar federal relief. **Rose v. Lundy**, 455 U.S. 509, 515 (1982); **Rodriguez v. Peters**, 63 F.3d 546, 555 (7th Cir. 1995).

13.     Therefore, a federal court cannot address the merits of constitutional claims brought in a petition for habeas corpus relief unless the state courts have had a full and fair opportunity to review them.   **O'Sullivan v. Boerckel**, 526 U.S. 838, 844 (1999).

14.     Thus, in order to avoid procedural default, a petitioner must afford the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."   **Id.; see also Verdin v. O'Leary**, 972 F.2d 1467, 1473 (7th Cir. 1992).

15.     The law allows an exception to procedural default of habeas claims. Basically, if a petitioner has procedurally defaulted his claims, a Court can reach the merits of the claims if the petitioner is able to demonstrate (1) **cause** for the default **and** actual **prejudice** as a result of the alleged violation of federal law, **OR** (2) that the failure to consider the claims will result in a fundamental **miscarriage of justice**. **Coleman v. Thompson**, 501 U.S. 722, 750 (1991); **Steward v. Gilmore**, 80 F.3d 1205, 1211-12 (7th Cir. 1996).

16.     Sufficient cause to excuse procedural default has been defined as "some objective factor external to the defense" which precluded petitioner's ability to pursue his claims in state court.   **Murray v. Carrier**, 477 U.S. 478, 488 (1986).

Ordinarily, this "requires a showing of some external impediment preventing counsel [or petitioner] from constructing or raising the claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citing *Murray*, 477 U.S. at 492).

17.     A Petitioner must also then show the resulting prejudice stemming from the cause.  Prejudice is shown when such alleged violation of a petitioner's federal rights " 'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Id.* (citing *U.S. v. Frady*, 456 U.S. 152 (1982)).

18.     Demonstrating a "miscarriage of justice" in order to except a petitioner's procedural default requires a showing of the petitioner's *actual innocence* "of the offense for which he was convicted i.e., that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court." *Id.*

**(3)     The *Strickland* Standard for Ineffective Assistance of Counsel**

19.     The Sixth Amendment right to counsel is more specifically stated as the right to *effective* counsel.  **Strickland v. Washington, 466 U.S. 668, 686 (1984)**. Therefore, "[t]he benchmark for judgment any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

20.     Under *Strickland*, a party alleging ineffective assistance of counsel must prove (1) that the trial counsel's "representation fell below 'an objective standard of reasonableness,' " and (2) "that 'there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different.' "**Bell, 535 U.S. at 695 (quoting Strickland, 466 U.S. at 688, 694); see also Davis v. Lambert, 388 F.3d 1052, 1059 (2004)(also citing Strickland)**.

21.    The Court must keep in mind, however, that its after the fact review of counsel's performance is " 'highly deferential,' " and thus, counsel's conduct is afforded a " 'wide range of reasonable professional assistance.' " **Id. (quoting Strickland, 466 U.S. at 689)**.  In other words, a party must show that, under the circumstances, conduct of counsel could not reasonably be considered "sound trial strategy." **Id.**

**B.    ANALYSIS**

**(1)    Whether Petitioner is Entitled to Habeas Review Under ADEPA**

22.    In the Court's previous Order, it found that the state courts, "in requiring [Petitioner] to show that the witnesses' testimony would have changed the result in his case . . . imposed a standard[6] even more rigorous than that rejected in

---

[6]  For example, as quoted by the Court in its Order (Doc. 54), during Petitioner's post-trial proceedings, the Illinois state circuit court Judge, in considering Petitioner's ineffective assistance of trial counsel claim pursuant to the requirements of **Strickland**, stated "I don't believe that the defendant has shown any failure of Mr. Allard to act in the way he's indicated *would have changed the outcome of this case.*"  The Judge further stated "any failure of Mr. Allard to call witnesses to further show those inconsistences were not error, and *would not have changed the outcome of this case*" (*Id*. at 5, citing Transcript of Petitioner's Sentencing, pp. 30-33)(emphasis added).
          When considering the state circuit court's denial of Petitioner's direct appeal, the Illinois Appellate Court also applied a more rigorous standard than required by **Strickland**, as noted by the Court in its Order (*Id*. at 7-8), stating "[w]e find that defense counsel's performance did not fall below an objective standard of reasonableness, and in any event Stanley was not so prejudiced by any of the alleged mistakes *that the outcome of the trial would have been different*" (*Id*.)(emphasis added).  The Illinois Supreme Court did not correct this stricter application of **Strickland**, but instead denied Petitioner's leave to pursue his direct appeal (*Id*. at 8).

***Strickland***"[7] (Doc. 54, p. 17, internal citations omitted).

23.    Therefore, the Court finds that under AEDPA it may review Petitioner's Amended Habeas Petition because the state courts, in denying Petitioner's post-trial and post-conviction motions, applied the ***Strickland*** standard for ineffective assistance of counsel in a way that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." ***Martin*, 424 F.3d at 590 (quoting 28 U.S.C. § 2254(d))**.

24.    However, the Court must still determine whether any of Petitioner's habeas claims are barred from federal review by procedural default.  In Petitioner's Objections to the R&R (Doc. 52), Petitioner concedes that the Magistrate's findings that certain claims were in procedural default, but objects to the Magistrate's finding that Petitioner failed to show circumstances to except those claims from procedural default (*Id*. at 3).

25.    Therefore, the Court finds only the following of Petitioner's habeas claims are not in procedural default – trial counsel's failure to interview Dwana Stanley, Robert Brock, Bryant Swygeart, and Lavonda McNair (*see* Doc. 34, pp. 5-10).

26.    Under the ***Strickland*** standard, the Court will first review Petitioner's claims which have not been procedurally defaulted to determine whether Petitioner

---

[7]  The Court, in its previous Order, also noted that the United States "Supreme Court specifically rejected the notion that a defendant 'must show that counsel's deficient conduct more likely than not altered the outcome of his case' " (*Id*. at 17, quoting ***Strickland*, 466 U.S. at 694**).

has proven ineffective assistance of trial counsel in order to warrant a writ of habeas corpus.  Next, the Court will examine whether any exception applies to Petitioner's procedurally defaulted claims to warrant their consideration as well.

**(2)    Review of Petitioner's Habeas Claims Not in Procedural Default**

27.    Petitioner claims that his trial counsel, attorney John Allard ("Allard"), was ineffective for failing to interview Dwana Stanley, Robert Brock, Bryant Swygeart, and Lavonda McNair[8] in order to investigate their stories and statements.

**(i)    *Dwana Stanley***

28.    The Court finds that Allard's failure to interview Dwana Stanley, Petitioner's sister, was not reasonable in light of the fact that she was the only witness, aside from James Dean, to implicate Petitioner for the murder.  Allard testified that although he was not positive, he believed that he spoke with Ms. Stanley only once, briefly before she took the stand at Petitioner's trial (Evid. Hr., Ex. 18 - S. Tr., p. 12).  Ms. Stanley's statement to the police indicates that she was uncertain of the date on which she had a conversation with Petitioner, her brother, in which he stated that "he'd just killed someone" (Evid. Hr., P's Exs. 1 & 2).  Her statement reads that the conversation occurred at approximately midnight on either the 21st or 22nd of December, 1993 (*Id.*).  Ms. Stanley's statement was given to the police on

---

[8] Although the Magistrate, in the R&R, found Petitioner's claim regarding Allard's failure to interview Lavonda McNair not procedurally defaulted, Petitioner did not introduce any evidence in this regard at the habeas evidentiary hearing on January 24, 2006, nor did Petitioner address this claim in its subsequently-submitted Brief in Support of his Amended Habeas Petition (Doc. 82), therefore, the Court is unable to make any findings or draw any conclusions regarding this particular claim.

December 28, 1993 (*Id*.).  To further substantiate, when Ms. Stanley testified during Petitioner's post-conviction hearing, she stated that she was never certain of the exact date of her conversation with Petitioner, (October 20, 1998 Post-Conviction Hearing Tr., pp. 41-42.

      29.    Allard indicated that because he had reviewed Ms. Stanley's statement to the police, he did not believe it necessary to interview her himself prior to Petitioner's trial (*Id*. at 13).  Given the fact that there was no *physical* evidence to link Petitioner to the crime – that only the testimony of Ms. Stanley and James Dean implicated Petitioner – it is difficult to see how an attorney could reasonably prepare an adequate defense without investigating the facts surrounding Ms. Stanley's story. Merely reading the statement she gave to the police is not enough.  During Ms. Stanley's cross-examination at trial, Allard brought out the fact that Petitioner often told grandiose tales about fighting or killing people when he'd been drinking (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 63-64).  It was evident from her police statement that Ms. Stanley was unsure of the date on which her conversation with Petitioner took place – a crucial fact in negating the State's time line for the murder and for possibly discrediting her testimony.  A reasonable attorney would have, at the very least, attempted to spend as much time as possible prior trial to determine if there was some information to use to discredit Ms. Stanley's testimony, whether that be her uncertainty of the date of her conversation with Petitioner or even the nature of her relationship with her brother.  Witness Lee Lawless, Petitioner's expert, testified regarding potential evidence of a motive for Ms. Stanley to lie about her brother.

**(ii)    *Robert Brock***

30.    The statement given by Brock to police indicated that he had witnessed a physical fight between James Dean and the victim, Sammie Wilborn, earlier in the evening on the night of Wilborn's murder (Evid. Hr., Exs. 6 & 7 - Brock's statements).  Although his statement did not truly indicate the intensity of this fight, during Brock's deposition, taken on behalf of Petitioner's habeas petition, he testified that Dean and Wilborn had a fight that lasted about five minutes – both were throwing punches and Wilborn tried to hit Dean with a wine bottle.  (Evid. Hr., Ex. 19 - Brock Depo. Tr., pp. 39-40, 43-45, 47-48).  Although Dean himself admitted during his testimony at Petitioner's trial that he had fought with Wilborn earlier that evening, because Wilborn wanted Dean to give him back his "straight shooter," he testified that it wasn't "that serious," – nobody had to break it up (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 37-38).  In fact, the State referred to this altercation in its closing argument as a "tussle or a playful argument" (Evid. Hr., Ex. 17 - Trial Tr., Vol. II, p. 43).

31.    Allard did not interview Brock, but only read his statement given to police, and indicated that based upon that reading and perhaps Brock's prior criminal record (and known drug-use), he may have decided as a matter of trial strategy not to interview or use Brock as a witness (Evid. Hr. Tr., pp. 74-77).  However, Dean's testimony was the only eye-witness testimony that implicated Petitioner for Wilborn's murder.  Any witness that could possibly show discrepancies in Dean's story or to show that Dean had a motive for murdering Wilborn would have

Page 18 of 38

been invaluable, especially considering Dean himself had a criminal record and was known to abuse drugs.[9]  Declining to so much as interview Brock left Allard with nothing to counter Dean's testimony and therefore, the jury believed that Dean's altercation with Wilborn was merely a minor scuffle, when it could have proven more serious.  Considering Dean was one of, if not *the* "star" witnesses for the State, it was Allard's duty to reasonably investigate any witness who could potentially poke holes in Dean's story.

### (iii)   *Bryant Swygeart*

32.    In Bryant Swygeart's statement to the police regarding Wilborn's murder, he stated that he had been with Wilborn since about 6:00 p.m. on December 21, 1993 and had last seen him at about 1:00 a.m. on December 22, 1993  (Evid. Hr., Ex. 4 - Swygeart's statement).  As the Government asserted that the time of Wilborn's murder was approximately 12:00 to 12:30 a.m. the night of December 21st or the early morning of December 22nd, Swygeart's testimony could have been used to question the State's time line.  Such testimony would have directly refuted the testimony of Tamara Evans, who testified on behalf of the State that she had been awakened by gunfire in the vicinity of Wilborn's murder "between 12:00 and 12:30" (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, p. 100).  Swygeart could also have testified to the

---

[9]  During Petitioner's trial, Allard was able to secure a special jury instruction which stated that if the jury found that Dean was a drug addict or used narcotics at the time of the alleged crime, his testimony was to then be subject to suspicion and considered with great caution (*see*, *e.g.*, Evid. Hr., Ex. 17 - Trial Tr., Vol. II., pp. 51).  However, the Court does not find this instruction to be as beneficial as having an actual witness (Brock) testify to discredit Dean's testimony.

fact that Wilborn was often seen driving with Stanley Williams, the owner of a white Buick Riviera, an automobile similar to the one Petitioner had been driving the night of the murder (Evid. Hr., Ex. 4 - Swygeart's statement). This information would have complimented Tamara Evans's testimony. Evans was a witness who lived near the crime scene who stated that on December 22, 1993, around twelve or 12:30 a.m., she heard one to two gunshots and saw a long white car parked on the street (Evid. Hr., Ex. 17 - Trial Tr., pp. 99-104).

33.    Allard testified that he reviewed Swygeart's statement to the police, but did not interview him personally to further investigate (Evid. Hr., Ex. 18 - S. Tr., pp. 12-13). He therefore could not give a valid reason why choosing not to interview or use Swygeart as a witness was part of a reasonable trial strategy. Obviously, Swygeart's testimony would have been crucial to create reasonable doubt about whether Petitioner actually committed murder, as it would have aided to discredit the State's time line and created the possibility Wilborn was not in Petitioner's car that night, but could have been riding in Stanley Williams's white Buick Riviera.

### (iv)    *Whether the Strickland Standard Was Met*

34.    In determining whether Petitioner has shown that Allard provided him ineffective assistance of trial counsel under the **Strickland** standard, the Court is mindful that it should not attempt to play "Monday morning quarterback." In other words, the United States Supreme Court has previously cautioned that there must be a strong presumption that counsel's conduct was reasonable, "because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the

harsh light of hindsight." **Bell, 535 U.S. at 702 (citing Strickland, 466 U.S. at 698)**. Nevertheless, it is also important that a reviewing court "also not construct strategic defenses which counsel does not offer." **Davis, 388 F.3d at 1064 (quoting Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990))**.

35.   The Seventh Circuit has "repeatedly found that counsel's failure to investigate potential witnesses can constitute deficient performance [of counsel, under the first prong of **Strickland**]." **Davis, 388 F.3d at 1062-64 (noting that this performance is particularly harmful when the person not investigated by counsel would have offered testimony to impeach the State's star witness); see also Washington, 219 F.3d at 631 (internal citation omitted)**.

36.   The Court finds the situation at bar to bear an uncanny resemblance to the **Davis** case, which also dealt with a § 2254 habeas petition, claiming ineffective assistance of trial counsel. **Id. at 1058-59**.  Like this case, Davis, who was convicted of second-degree murder, was ultimately allowed an evidentiary hearing in federal court on his **Strickland** claim under § 2254(e)(2).  In analyzing whether Davis was entitled to such hearing, Davis stated that his trial attorneys never investigated any of the witnesses he identified within his habeas petition in order to bolster his self-defense claim, nor did his attorneys call any defense witnesses.  **Id. at 1062**.  In response, Davis's trial attorney explained his decision not to call these witnesses was that the "theory of the case didn't require the use of those witnesses." **Id.**  However, the Seventh Circuit noted that Davis's attorney offered no further explanation of "how

he knew this without even talking to the witness." *Id.*  In considering the evidence presented at the hearing regarding the witnesses Davis claimed his attorneys refused to investigate, the Seventh Circuit found that Davis's attorney did not have a "strategic defense," stating:

> In *Hall*, we explained that an attorney's decision not to present particular witnesses "can be strategically sound if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant.  Such a determination can rationally be made, however, *only after some inquiry or investigation by defense counsel.*

*Id.* at 1064 (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997))(emphasis added).

37.    Although the Seventh Circuit merely granted the evidentiary hearing and did not ultimately decide whether Davis should be issued a writ of habeas corpus based upon his *Strickland* claim, the Court considers the Appellate Court's opinion regarding performance of trial counsel very insightful in determining the merits of the Petitioner's *Strickland* claim herein.

38.    As previously stated, the first prong under *Strickland* is to find that trial counsel's performance fell below an objective standard of reasonableness. *Davis*, 388 F.3d at 1060.  The Court finds that in this case, the first prong has been met – Allard's performance as Petitioner's trial counsel fell below an objective standard of reasonableness.  During the hearing on Petitioner's motion for a new trial (conducted immediately prior to Petitioner's sentencing), Allard testified that he

had only met with Petitioner once briefly before trial (Evid. Hr., Ex. 18 - S. Tr., pp. 10-11).  He admitted that he did not interview any of the witnesses identified by the State, including Dwana Stanley, Robert Brock and Bryant Swygeart (*Id*. at 12-13). Instead, he relied only upon the information conveyed by their written statements derived from their interviews with the police.

39.    It was evident that Dwana Stanley was one of the State's strongest witnesses to implicate Petitioner for Wilborn's murder.  Reflecting, Allard classified her testimony as "the most damaging . . ." (*Id*. at 21).  It was evident from her written statement that she was unclear of the date of her conversation with Petitioner on which he made his confession to her.  Yet no one knew of the nature of the relationship Ms. Stanley had with her brother at that time.  The possibility exists that there could have been some bad blood between the two siblings.  Logic would dictate that because Ms. Stanley was one of the State's two most important witnesses, her statement may have shown a possible discrepancy in the State's time line if further investigated, an interview was warranted in order to prepare Petitioner's defense. The Court finds that to do otherwise was unreasonable.

40.    Similarly, Robert Brock, if interviewed, could have provided testimony to not merely corroborate Dean's admission that he had been in a fight with the victim the evening the murder took place, but instead to show that the fight was more intense than the jury was lead to believe.  Such testimony could have shown that it was Dean himself who had motive to murder Wilborn that night.  However, Allard

urged that he cross-examined Dean "quite extensively about it" (*Id*. at 13-14).[10]
Clearly, putting a witness on the stand to testify that the altercation between Dean
and Wilborn was more severe than Dean let on would have served to discredit or
possibly even impeach the testimony of the State's only eye-witness.  Further, Brock's

_____

[10] What Allard referred to as "extensive" cross-examination consisted of the following:

**Q:**   And while you're out on Crenshaw you and Sammie Wilborn get into an argument, is that right?

**A:**   Yeah, cause he wanted his shooter back.

**Q:**   And it was a pretty good argument, wasn't it?

**A:**   No.

**Q:**   You weren't pushing him?

**A:**   No.

**Q:**   There's no pushing and shoving going on?

**A:**   No.

**Q:**   But you didn't give it back to him at that point, did you?

**A:**   No.

**Q:**   Somebody have to break this argument up?

**A:**   No.

**Q:**   You know Robert Brock?

**A:**   Yes.

**Q:**   Okay.  Was he there that evening?

**A:**   I don't know.

**Q:**   He didn't come over and break the fight up between you and Sammie Wilborn?

**A:**   No, no.  It ain't that serious.

(Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 37-38.)

written statement also mentioned that Wilborn's murder may have been the result of some family feud between Dean's family and another family – which may have provided yet another motive for the murder (Evid. Hr., Exs. 6 & 7 - Brock's statements).  Considering Petitioner's defense did not raise an alternate "whodunit" theory (although the Court notes that one was not necessary), it would have been reasonable strategy for Allard to explore this possibility in preparing Petitioner's case.  Concluding that Brock would not have made a good witness because he had prior convictions is not reason enough to decline to simply interview him, given the fact that Allard knew Dean also had prior convictions and was a drug addict.  The jury was evidently able to believe Dean's testimony, at least in part, in order to convict Petitioner.  The Court finds that Allard's decision not to investigate the facts surrounding Brock's statement and/or interview Brock to determine whether his testimony would have aided Petitioner's defense was unreasonable.

41.    Additionally, Allard did not investigate Bryant Swygeart, whose written statement asserted that he had last seen Wilborn at 1:00 a.m. on the night of the murder (Evid. Hr., Ex. 4 - Swygeart's statement).  Swygeart further offered the fact that Wilborn was often seen driving with Stanley Williams, who owned a '78 or '79 white Buick Riviera – matching the general description of the vehicle seen by Tamara Evans on the night of the murder.  Swygeart's testimony may have called into doubt whether Wilborn was actually in Petitioner's car just before the murder occurred or whether he was actually in another car instead.  Yet, Allard felt that in reading Swygeart's written statement, he had nothing to offer that warranted further

exploration.   Again, as this testimony certainly could have offered strength to Petitioner's defense, the Court finds that Allard's failure to interview Swygeart and/or to further investigate the facts asserted in his statement was unreasonable.

42.   Perhaps Petitioner's counsel, Ms. Hatch, during the hearing on his motion for a new trial summed it up best, arguing:

> An attorney has a responsibility to at a minimum interview the potential witnesses, including the sister, Dwana Stanley, to find out what they may or may not know of the incident and to subpoena witnesses after interviewing the, that could provide conflicting testimony.  This was never done. . .This is not a situation where we can just boil it down to trial strategy by defense counsel.  If his counsel never talked with any of the witnesses and did not ever subpoena any of them, then you can't have the argument used that, well, it was just his strategy not to talk to any of them or not to subpoena any of them.   This is for the jury to decide, without any of the conflicting testimony.  All they got was a one-sided view of my client's possible involvement in the crime.

(Evid. Hr., Ex. 18 - S. Tr., pp. 27, 30.)

Accordingly, the Court finds that Petitioner has shown that Allard's assistance as trial counsel fell below an objective reasonable standard.

43.   Now the Court must determine whether the second prong of ***Strickland*** has also been met: whether there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different, keeping in mind that a reasonable probability is one that sufficiently undermines confidence in the outcome. ***Davis*, 388 F.3d at 1060, 1064**.  The Court finds that unlike the stricter standard imposed by the state courts, ***Strickland*** only requires

a "reasonable probability" the outcome would have been different.  Had Allard interviewed Ms. Stanely, Brock and Swygeart, he could have introduced evidence that could have likely created reasonable doubt in the jury's mind and such reasonable doubt could have led the jury to find Petitioner was not guilty of the murder of Sammie Wilborn.

### (3)   Review of Petitioner's Procedurally Defaulted Habeas Claims

44.   Even though the Court has found that Petitioner has prevailed on his claim that Allard, his trial counsel, was ineffective under the ***Strickland*** standard in order to warrant a writ of habeas corpus, the Court will analyze the evidence presented in support of Petitioner's procedurally defaulted claims in order to determine whether Petitioner has met the "miscarriage of justice" exception, so that the Court may then review the merits of these claims.

45.   Petitioner does not now object to the Magistrate's findings in the R&R that certain of his claims were procedurally defaulted for failure to raise them consistently throughout state court proceedings.  However, Petitioner asserts that the claims, when considered in their totality, will amount to a miscarriage of justice if they are not reviewed by the Court.  However, the standard for demonstrating a miscarriage of justice is even higher than the ***Strickland*** standard.  It requires showing the petitioner's *actual innocence* – that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court.

46.   Petitioner presented evidence at the habeas evidentiary hearing on

January 24, 2006, regarding his procedurally defaulted claims that: (1) Allard failed to properly prepare for trial by investigation and/or interviewing Tamara Evans, Lacy Green, James Dean, and Michael Stanley; (2) Allard failed to investigate the scene of the crime or to have command of the materials at issue in the case (Doc. 82, p. 22).

### (i)    *Tamara Evans*

47.    During Petitioner's trial, Tamara Evans testified that on the night of December 21, 1993, through the early morning of December 22, 1993, she was at her residence on Third Avenue in Centreville, Illinois (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, p. 99). She was awakened by the sound of her dogs barking (*Id.*). She then heard one to two gunshots fired between twelve and 12:30 a.m. (*Id.* at 100). She further testified that when she went to look out the window, she saw a long white car sitting on Third Avenue (*Id.*). Evans stated that the car had a square back and looked as though there was a spare tire on the back of it (*Id.*). Because it was dark, Evans stated that she was not able to see anybody near or inside of the car (*Id.* at 101-102). During cross-examination, Allard brought out the fact that Evans stated she heard around one to two shots and not ten, nor were the shots fired in rapid succession (*Id.* at 103). Allard also asked whether she saw a body after the car drove off, to which she replied, "No, I didn't" (*Id.*).

48.    Evans's written statement she gave to the police on the morning of December 22, 1993, states, "I didn't look at any clock, but I know it was after midnight when I first heard the gunshots and saw the white car" (*Id.*). Had Allard interviewed Evans before the trial, he might have been able to establish the

possibility that Evans could not conclusively state when she heard the gunshots fired,

which could have served to further discredit the State's time line for the murder.

More importantly, an interview would have allowed Allard the opportunity to show

Evans photographs of several cars, among them the car Petitioner had been driving

that night, to determine whether the type of car she saw resembled the car Petitioner

had been driving.[11]   Allard could have also shown her a picture of Stanley Williams's

---

[11]   The State responds in its brief that at the habeas evidentiary hearing on January 24, 2006, that Allard was able to impeach Evans during trial with the fact that the car she saw was white, when the car Petitioner had been driving was described by another witness, Willie Snipes, as yellow (Doc. 86, p. 31, citing Jan. 24, 2006 Evidentiary Hearing Tr., pp. 62, 68).   The Court does not feel that the following portion of Evans's cross-examination qualifies as "impeachment" in order to properly emphasize to the jury that Evans's description of the car she saw differed from the car Petitioner had been driving on the night of the murder.   Allard's impeachment basically consisted of the following question:

**Q:**   Miss Evans, the shots that you heard, could you tell whether they came from the area where the white car was or not?

**A:**   Well, I just assumed that the car had shot towards my dogs, thinking that they was shooting to keep them from running behind them.   So I would say yes.

(Evid. Hr., Ex. 17 - Trial Tr., Vol. I, p. 104.)

The Court feels that this statement does not present the differing description of the car color in front of the jury at the moment of "impeachment."   Further, the discrepancy of the car description was not raised in Allard's closing argument (*see* Evid. Hr., Ex. 17-Trial Tr., Vol. II, pp. 50-53).   The majority of testimony regarding car color came about during the State's direct examination of Evans and Snipes.   It seems to be a non-issue to the defense, especially given the fact that the sum total of Allard's cross-examination of Willie Snipes consisted of the following:

**Q:**   Mr. Snipes, prior to the police officer coming and towing you car, you did not get into the car and clean it out or anything like that, is that correct?

**A:**   No.

**Q:**   You didn't get back into the car?

**A:**   No.

**Q:**   That's all I have.

(Evid. Hr., Ex. 17 -Trial Tr., Vol. I, p. 52.)

white Buick Riviera, which Wilborn was known to ride in, to determine whether that was more along the type of car she saw.

### (ii)   *Lacy Green*

49.     Lacy Green did not testify during Petitioner's trial.  However, she was interviewed by police the morning of December 22, 1993 (Evid. Hr., Ex. 5 - Police Report).  It appears that Green resides near where Wilborn's body was found.  Green stated to police that she arrived home at 1:30 a.m. sharp on the early morning of December 22, 1993.  As her headlights swept the intersection as she turned into her driveway, she stated that she did not observe anyone laying in the street directly down from her home, nor did she observe anything unusual or hear gunshots (*Id.*).  Had Allard interviewed her, he would have been able to use her as a witness to introduce further testimony to discredit the State's time line of when Wilborn's murder occurred.

### (iii)   *James Dean*

50.     James Dean was the State's "star" eye-witness at Petitioner's trial.  During the trial, Dean testified that he, the Petitioner and Wilborn were hanging out together at the projects on Crenshaw, the night of December 21, 1993 (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, p. 19).   Dean stated that he and Wilborn were smoking marijuana and crack cocaine, but that Petitioner was not (*Id.* at 20).  However, Dean testified that both Wilborn and Petitioner had been drinking that night (*Id.*).  Dean stated that he and Wilborn had been arguing over Wilborn's straight shooter – he had wanted Dean to give it back (*Id.* at 22).  Dean then stated that he got into the

passenger's seat of the car Petitioner was driving that night, a yellow Lincoln, and Wilborn then got into the back seat behind the passenger's side (*Id.* at 23-24). Dean stated that Petitioner was already sitting at the wheel when he got into the car (*Id.*). According to Dean, Petitioner then drove around the back streets of Centreville, when Petitioner got to cussing, saying "punk mother fucker," repeatedly (*Id.* at 24). Dean then asked Petitioner to take him back to the projects, but Petitioner kept driving (*Id.* at 25). Dean then testified that he saw a gun in the car – an automatic German gun, black with a brown handle approximately ten inches long – on the front seat (*Id.* at 26-27). After about fifteen to twenty minutes, Petitioner stopped the car and pulled over so that Wilborn could get out to urinate. As both Wilborn and Petitioner exited the car, Dean stated that he turned to keep an eye on them, because he knew Petitioner had a gun (*Id.* at 27-28). Dean then stated that he heard a shot and then heard Wilborn say "Hey, man!" and then he heard another shot, so he got out of the car and took off running (*Id.* at 28). Dean testified that he heard a total of three shots (*Id.* at 29). The State asked if Dean could see Petitioner and Wilborn standing outside of the car – Dean answered that Petitioner was standing directly behind Wilborn (*Id.* at 30-31). Dean then testified that a few days later, Petitioner came to his house and revealed to him that Wilborn had previously messed up Petitioner's eight ball of cocaine (*Id.* at 33). Dean stated that Petitioner had also said that he would not hurt Dean (*Id.* at 34). During cross-examination, Dean testified that he had actually seen "the fire come from the barrel" of the gun and that he actually saw Petitioner shoot Wilborn twice, and that was when Dean took off running (*Id.* at 40-

41).

51.     Dean was later deposed for the purposes of Petitioner's habeas evidentiary hearing in federal court, and also testified during that hearing on January 24, 2006. Between his trial testimony, deposition and evidentiary hearing testimony, there are several glaring discrepancies worth noting. At his deposition, taken on August 11, 2005, Dean testified that he did not actually *see* Petitioner shoot Wilborn (Evid. Hr., Ex. 22 - Dean Depo., pp. 74); but during trial, Dean had testified that he *had* seen Petitioner shoot Wilborn (Evid. Hr., Ex. 17 - Trial Tr., Vol. I, pp. 40-41). During the recent evidentiary hearing, Dean also testified that he had *not* seen Petitioner with a gun, nor had he actually seen Petitioner shoot Wilborn – he just heard a shot and took off running (January 24, 2006 Evidentiary Hearing Tr., pp. 120-122).

52.     The record, developed in this habeas corpus proceeding, clearly shows that there is a material difference in Dean's testimony from the time of Petitioner's trial until now. Because Dean was the only supposed eye-witness to the crime, Allard should have interviewed him; he may have easily uncovered these material inconsistencies that could have discredited Dean's trial testimony and created reasonable doubt for the jury.

### (iv)    *Michael Stanley*

53.     Michael Stanley did not testify at trial, but he gave a statement to police and testified during Petitioner's habeas evidentiary hearing. Michael Stanley is Dwana Stanley's son – Petitioner's nephew. Michael Stanley resided with Dwana

Stanley during the time around Wilborn's murder.   Michael Stanley's written statement to police stated that about a month prior to Wilborn's murder, he had observed Petitioner in possession of a rust-colored .22 automatic pistol with a brown handle, which Petitioner kept in his room (Evid. Hr., Ex. 3 - M. Stanley's statement). At that time, Petitioner was living at Dwana Stanley's house.  Michael Stanley testified during the evidentiary hearing that the gun he described to police when he gave his statement was "a .22 rifle, long rusty gun with a brown handle with tape on it," approximately 18 to 19 inches in length (Evid. Hr. Tr., pp. 91-91).  Michael Stanley further testified that this gun could only hold one bullet in it at a time (*Id*. at 94).  He stated that when questioned by police, they repeatedly asked him whether the gun he had seen was black and automatic and possibly less than 18 inches in length (*Id*. at 95-96).  Essentially, Michael Stanley testified that he felt as though the police were trying to convince him the gun he had seen Petitioner with about a month prior to Wilborn's murder was smaller, black and an automatic – a description of a weapon different from the one he had actually seen (*Id*. at 96-97). Michael Stanley therefore testified that the description of Petitioner's gun in his written statement differed from the description he actually gave the police that day (*Id*. at 97).  He also testified that he slept in a room right next to the kitchen and did not recall overhearing a heated conversation between his mother, Dwana, and Petitioner the early morning of December 22, 2004 (*Id*. at 97-100).  Lastly, Michael Stanley testified that it was common for Petitioner to brag and exaggerate about doing things to people when he was drunk or high – but that he believed Petitioner's statement were untrue (*Id*. at

101-102).

54.     The Court finds that had Allard interviewed Michael Stanley, he may have discovered that the description of Petitioner's gun he gave to police actually differed from that in his written statement to police, as well as the description given by his mother, Dwana Stanley.  This may have created the impression that the police were trying to streamline his description to match the other witnesses' statements, thereby raising doubt as to whether Petitioner actually owned the gun as described by Dean and Ms. Stanley.  Also, because Michael Stanley's testimony that Petitioner often trashed talked when he was drunk or high on drugs mirrored similar testimony given by Ms. Stanley, this may have downplayed Petitioner's "confession" to his sister – especially if Allard would have been able to show Ms. Stanley was uncertain the conversation actually took place after Wilborn's murder and not before.

**(v)**     *The Crime Scene and the Evidentiary Materials*

55.     Presented on Petitioner's behalf at the habeas evidentiary hearing were many of the trial exhibits, including a computer drawn map of the location showing where Wilborn's body was found (Evid. Hr., Ex. 16 - Map).  This map depicted that Wilborn's body was found facing north on Cooper Place just north of Third Street, and that bullet casings were found in a small group all within close proximity of one another (*Id.*).  Petitioner's criminal defense expert, Lee Lawless, testified at the evidentiary hearing, questioning whether someone could have been shot in the head nine times before falling to the ground, considering the closeness of the recovered

shell casings in relation to one another,[12] leading one to believe the crime scene may have been staged (Evid. Hr. Tr., pp. 173-174).

56.    Photographs of Wilborn's body as it was found by police on December 22, 1993 were also admitted into evidence during the evidentiary hearing (Evid. Hr., Group Ex. 20 - Photos).  The photographs demonstrated that Wilborn was found with his pants pulled to his waist with his belt firmly affixed – which does not fit with Dean's story that Wilborn had been shot by Petitioner while standing outside of Petitioner's car to urinate.

57.    Visiting the crime scene would have helped Allard to determine whether Evans's story that she had been able to see a white car from her window the night of the murder actually checked out.

58.    The Court also finds that Wilborn's autopsy report indicates that a large caliber bullet was retrieved at the base of the tongue (Evid. Hr., Group Ex. 14 - Discovery Material, p. 109).  The fact that this bullet differed from a .22-caliber would possibly indicate Wilborn was shot by two different guns, serving to discredit Dean's testimony that Petitioner was the one who shot Wilborn.  However, Allard did not explore the discrepancy within the autopsy report.

59.    When taking into account Allard's errors regarding Petitioner's habeas claims which were *not* found to be in procedural default, discussed *supra*, along with

---

[12] Lawless opined that because Wilborn had been shot in the head, one would assume he would have fallen to the pavement, and therefore the location of the later shots would have changed because the location of the gun in regard to his head, thereby changing the trajectory of the other shots (Evid. Hr. Tr., p. 173).

the totality of the evidence submitted regarding Petitioner's habeas claims which were technically in procedural default, the Court finds that to not consider these claims would amount to a miscarriage of justice.  In other words, the Court believes that the cumulative effect of the evidence introduced to develop the record during Petitioner's January 24, 2006, habeas evidentiary hearing shows that *had* Petitioner actually received his Sixth Amendment right to effective assistance of trial counsel (or *but for* the errors of his trial counsel), no reasonable juror would have found him guilty of the murder of Sammie Wilborn, as significant reasonable doubt would have been shown to exist.

## IV.  CONCLUSION

The Court does not wish to appear apathetic towards the grave injustice committed upon Mr. Wilborn and his family the night of his murder.  Although the severity of this tragic loss continues to resonate with the Court, in good conscience it cannot allow the violation of Petitioner's Sixth Amendment right to effective assistance of counsel to go unnoticed or unremedied.  Absent speculation, it is clear that Petitioner's trial counsel, John Allard, failed to interview any witnesses in order to prepare an adequate defense.  He only met briefly with Petitioner once before trial.  He did not call any witnesses on behalf of Petitioner during trial and his cross-examinations of the State's witnesses typically amounted to no more than several pages of typed transcript.  When testifying on his own behalf,[13] Allard could not recall

---

[13] During Petitioner's post-conviction, direct appellate and habeas proceedings.

anything specific regarding his actions during Petitioner's trial or his trial preparation – he could not, therefore, justify anything amounting to reasonable trial strategy.  Though the Court may not approach its *Strickland* analysis of Allard's actions with 20/20 hindsight, it will also not breathe life into a trial strategy that cannot be shown to exist.  As the Court finds Allard acted below a reasonable standard, and thereby caused prejudice to Petitioner, under the *Strickland* standard, Petitioner's claim for ineffective assistance of trial counsel as stated in his Amended Petition for a Writ of Habeas Corpus (Doc. 15), must prevail.

Moreover, taking into the account the evidence presented regarding Petitioner's procedurally defaulted habeas claims and the new evidence developed in this proceeding not considered during Petitioner's trial, such matters only compound Allard's ineffective assistance as Petitioner's trial counsel.  The cumulative effect of such evidence is so great that the Court finds it may consider such procedurally defaulted claims pursuant to the miscarriage of justice exception allowed by law, to further support its finding that Petitioner has stated a valid claim of ineffective assistance of trial counsel and was therefore deprived of his Sixth Amendment right to counsel.  Due to the fact that the Court is granting Petitioner's request for a writ of habeas corpus pursuant to § 2254 of the AEDPA, despite Respondent's objections and affirmative defenses of procedural default, it finds that it need not consider the merits of Petitioner's Motion to Strike Respondent's Affirmative Defenses (Doc. 33) and such Motion is hereby deemed **MOOT**.

For the reasons stated herein, the Court **REJECTS** the R&R (Doc. 34) issued by Magistrate Judge Frazier, and as such, **GRANTS** Petitioner's Amended Application for a Writ of Habeas Corpus (Doc. 15).  Accordingly, Petitioner is ordered to be released from incarceration within 120 days of the date of this decision unless the state decides to retry him.  The Clerk of the Court shall enter judgment pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 58**.

**IT IS SO ORDERED.**

Signed this 28th day of March, 2006.

/s/          David RHerndon
**United States District Judge**